651 F.2d 532
 UNITED STATES of America, Appellee,
v.
JAMIESON-McKAMES PHARMACEUTICALS, INC., Pharmacare Generic
Drugs, Inc., Pharmacare, Inc., Payless Pharmacy,
Inc., James C. Jamieson, Sr., and James
C. Jamieson, Jr., Appellants.
UNITED STATES of America, Appellee,
v.
ALL EQUIPMENT INCLUDING, BUT NOT LIMITED TO, AN
ENCAPSULATING MACHINE NOT IDENTIFIED AS TO MANUFACTURER,
STAINLESS STEEL COATING PANS, A COLTON SINGLE STAGE ROTARY
TABLET PRESS, A FRATELLI ZANASI ENCAPSULATING MACHINE,
TABLET PUNCHES AND DIES, WHICH EQUIPMENT IS IN THE
POSSESSION OF JAMIESON-McKAMES PHARMACEUTICALS, INC., 3227
MORGANFORD ROAD, ST. LOUIS, MISSOURI, Appellant.
 Nos. 79-1367, 79-1708.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 11, 1981.
Decided May 21, 1981.
As Amended on Denial of Rehearings and Rehearing En Banc Aug. 7, 1981.
 
 Robert W. Saitz, St. Louis, Mo., Marc L. Sandberg, St. Louis, Mo., Irl B. Baris, St. Louis, Mo., for appellants.
 Sanford M. Litvack, Asst. Atty. Gen., Washington, D. C., Barry Grossman, Susan J. Atkinson, Attys., Dept. of Justice, Washington, D. C., for appellee; J. Patrick Glynn, Atty., Dept. of Justice, Washington, D. C., of counsel.
 Before LAY, Chief Judge, and STEPHENSON and ARNOLD, Circuit Judges.
 ARNOLD, Circuit Judge.
 
 
 1
 James C. Jamieson, Sr., and James C. Jamieson, Jr., individuals, and Jamieson-McKames Pharmaceuticals, Inc., Pharmacare Generic Drugs, Inc., Pharmacare, Inc., and Payless Pharmacy, Inc., corporations, appeal a judgment finding them guilty of criminal violations of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. They also appeal a civil order of condemnation and forfeiture of certain drug manufacturing equipment pursuant to 21 U.S.C. § 334(b). The criminal case, which resulted in convictions on one count of conspiracy to violate the Federal Food, Drug, and Cosmetic Act, and ten substantive counts of counterfeiting, misbranding, and adulterating of drugs, and the civil case were consolidated for trial before the district court[1] by consent of the parties.
 
 
 2
 The trial, which consumed more than twenty days, ended on January 17, 1978. The district court on March 29, 1979, filed its findings of fact in the criminal case. On July 23, 1979, an order, memorandum, and findings[2] were filed in the civil case. Each of the individual defendants was sentenced to imprisonment for terms of eight years and a fine of $5,000.00 on each of ten of the counts. The court suspended imposition of sentence as to count IV and placed the individuals on probation for a period of five years following the completion of the sentence of imprisonment under the other counts. Each of the four corporate defendants was fined the sum of $2,000.00 on each of the eleven counts, or $22,000.00 apiece, for a total of $88,000.00.
 
 
 3
 Asserted grounds for error are (1) that the searches and seizures conducted by the Food and Drug Administration (FDA) agents were in violation of the Fourth Amendment to the Constitution, (2) that certain statements made by the defendants to FDA agents were inadmissible because of violations of the Fifth Amendment, and (3) that the evidence was insufficient as to all criminal counts and the civil order of forfeiture and condemnation. In the main, we affirm.
 
 I. The Facts
 
 4
 Jamieson-McKames Pharmaceuticals, Inc. (Jamieson-McKames) is a Missouri corporation with its principal place of business in St. Louis, Missouri. The company manufactured, purchased, packaged, labeled, distributed, and sold drugs from before June 1972 until November 1975. Jamieson-McKames sold drugs directly to doctors, clinics, and pharmacies through defendants Pharmacare, Inc., and Payless Pharmacy, Inc. Jamieson-McKames's activities were carried out by defendant James C. Jamieson, Sr.; defendant James C. Jamieson, Jr.; James C. Jamieson, III, a part-time employee; and approximately five other employees.
 
 
 5
 Jamieson, Sr., was the president and treasurer of Jamieson-McKames and a member of its board of directors. He was also a member of the board of directors and vice-president and secretary of Pharmacare Generic Drugs and during 1975 a member of the board of directors of Pharmacare.
 
 
 6
 Jamieson, Jr., a board member, vice-president, and secretary of Jamieson-McKames, was also a member of the board of directors, president, and treasurer of each of the other corporate defendants.
 
 
 7
 Defendants Pharmacare, Inc. (Pharmacare), Payless Pharmacy, Inc. (Payless) and Pharmacare Generic Drugs, Inc. (Pharmacare Generic) were also Missouri corporations engaged in the business of manufacturing, purchasing, packaging, labeling, distributing, and selling drugs. In addition, Pharmacare and Payless operated five and two retail pharmacies respectively. The operations of Pharmacare, Pharmacare Generic, and Payless were closely interrelated with each other and with those of Jamieson-McKames. For example, the two Pharmacare pharmacies doing business in doctors' offices were opened only after an agreement was reached between Jamieson-McKames and the doctors in whose offices the pharmacies operated. Jamieson-McKames stocked the pharmacies, hired their employees, paid their bills, and shared the profits with the doctors. Drugs were frequently labeled with Pharmacare Payless Pharmacy labels whether the drug was for a Payless or a Pharmacare pharmacy, or for a pharmacy unconnected with any of the defendants.
 
 
 8
 Bills owed by the pharmacies operated by Payless and Pharmacare were forwarded to their common principal place of business, which was at the same location as Jamieson-McKames's principal place of business at 3227-29 Morganford Road in St. Louis. All of Pharmacare Generic's activities were carried out by Jamieson-McKames employees. Pharmacare Generic had no employees of its own, other than corporate officers.
 
 
 9
 On October 29, 30, and 31, and November 3, 1975, federal and state agents entered and searched the premises of Jamieson-McKames Pharmaceuticals, Inc., and Pharmacare, Inc., at 3227 Morganford Road, St. Louis, Missouri. Samples of drugs were taken, documents were taken, quantities of drugs were embargoed, the premises and contents photographed, and machinery seized. On October 29 and 30, 1975, defendant's premises at 714 West Pierce Road, Wentzville, Missouri, were also searched, and similar items were seized.
 
 
 10
 A civil complaint for forfeiture of certain items of equipment in the defendant's possession was filed by the government in the district court on December 19, 1975, alleging that the equipment was used or designed for use in making counterfeit drugs. Jamieson-McKames Pharmaceuticals, Inc., denied the allegations in its answer filed February 19, 1976.
 
 
 11
 Thereafter, on May 12, 1977, defendants were charged in an 11-count indictment with counterfeiting, adulterating, and misbranding drugs and conspiracy to counterfeit, adulterate, and misbrand drugs. The indictment also charged that the defendants committed all of these acts with the intent to defraud and mislead, rendering such felonies punishable under 21 U.S.C. § 333(b).
 
 II. The Fourth Amendment
 
 12
 The appellants contend that their Fourth Amendment rights were violated by the failure of the court to suppress evidence seized by government agents from the defendants' business premises at Wentzville, Missouri, and at the Morganford Road site in St. Louis, and from a building in St. Louis operated by the Chambers Medical Group.
 
 The Wentzville Search
 
 13
 The seizures at the Wentzville pharmacy were conducted on the authority of a notice to inspect authorized by 21 U.S.C. § 374(a).[3] The employee in charge was given a copy of the notice to inspect, but no warrant to inspect was obtained.
 
 
 14
 The Supreme Court has held that warrantless searches are generally unreasonable, and that commercial premises as well as homes are within the Fourth Amendment's protection. Marshall v. Barlow's, Inc., 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978). An exception from the search-warrant requirement has, however, been delineated for industries "long subject to close supervision and inspection," Colonnade Catering Corp. v. United States, 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970), and "pervasively regulated business(es)," United States v. Biswell, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972). Colonnade involved the liquor industry, and Biswell the interstate sale of firearms. The threshold question therefore is whether the drug-manufacturing industry should be included within this class of closely regulated businesses.
 
 
 15
 The appellants argue that the drug-manufacturing industry is no more closely regulated than any number of industries involved in interstate commerce, and that therefore the rule of Marshall v. Barlow's, Inc., supra, requiring a warrant in the absence of consent before an administrative search can take place, should apply. In Barlow's, the Supreme Court held that warrantless searches authorized by § 8(a) of the Occupational Safety and Health Act, 29 U.S.C. § 657(a), violated the Fourth Amendment. There, however, the government sought to inspect work areas not open to the public on the premises of an electrical and plumbing contractor. In Barlow's the argument that all businesses involved in interstate commerce had "long been subject to close supervision" of working conditions was urged by the Secretary of Labor but explicitly rejected by the Court. In rejecting this argument and others the Court specifically preserved the Colonnade-Biswell exception to the warrant requirement. The Court indicated that there were other industries, covered by regulatory schemes applicable only to them, where regulation might be so pervasive that a Colonnade-Biswell exception to the warrant requirement could apply. 436 U.S. at 313, 321, 98 S.Ct. at 1820, 1824.
 
 
 16
 Such warrantless searches are upheld because "when an entrepreneur embarks on such a business, he has chosen to subject himself to a full arsenal of governmental regulation," id. at 313, 98 S.Ct. at 1820 and " 'in effect consents to the restrictions placed on him'." Ibid., citing Almeida-Sanchez v. United States, 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973). Further, in the face of a long history of government scrutiny, such a proprietor has no "reasonable expectation of privacy." Ibid.
 
 
 17
 We think the drug-manufacturing industry is properly within the Colonnade-Biswell exception to the warrant requirement. The drug-manufacturing industry has a long history of supervision and inspection. The present Food, Drug, and Cosmetic Act has its origins in the Food and Drug Act of 1906, 34 Stat. 768. That Act was an attempt by Congress "to exclude from interstate commerce impure and adulterated food and drugs ..." and to prevent the transport of such articles "from their place of manufacture." McDermott v. Wisconsin, 228 U.S. 115, 128, 33 S.Ct. 431, 433, 57 L.Ed. 754 (1913).
 
 
 18
 The Biswell Court acknowledged that the history of regulation of interstate firearms traffic was "not as deeply rooted" as the history of liquor regulation, but included firearms within the warrant exception because their regulation was of "central importance to federal efforts to prevent violent crime and to assist the states in regulating the firearms traffic within their borders." United States v. Biswell, supra, 406 U.S. at 315, 92 S.Ct. at 1596. This passage teaches that the nature of the federal or public interest sought to be furthered by the regulatory scheme is important to our analysis. See Marshall v. Barlow's, Inc., supra, 436 U.S. at 337, 98 S.Ct. at 1833 (Stevens, J., dissenting). It is difficult to overstate the urgent nature of the public-health interests served by effective regulation of our nation's drug-manufacturing industry. Furthermore, virtually every phase of the drug industry is heavily regulated, from packaging, labeling, and certification of expiration dates,[4] to prior FDA approval before new drugs can be marketed.[5] The regulatory burdens on the drug-manufacturing industry are weighty, and that weight indicates that the drug manufacturer accepts the burdens as well as the benefits of the business and "consents to the regulations placed on him." Marshall v. Barlow's, Inc., supra, 436 U.S. at 313, 98 S.Ct. at 1820.
 
 
 19
 The final lesson of Barlow's is that the reasonableness of warrantless searches is dependent on the "specific enforcement needs and privacy guarantees of each statute." Id. at 321, 98 S.Ct. at 1824. In Barlow's the Court was unconvinced that requiring OSHA officials to obtain administrative warrants when consent to inspect was withheld would cripple the effectiveness of the enforcement scheme. The Court reasoned that most businessmen were likely to consent to inspections, and the Secretary's argument that a warrant requirement would impede enforcement was inconsistent with the fact that OSHA regulations promulgated by the Secretary themselves provided for obtaining warrants, even though the statute did not require it. Id. at 316-20, 98 S.Ct. at 1822-24. This Court is aware of no similar FDA regulation.[6]
 
 
 20
 Regulation of the drug industry differs from the OSHA situation in another significant way. The class sought to be protected by OSHA regulation of safety of work areas is made up of employees, who are in the work place itself and free to report violations at any time.[7] The protected class in the area of drug manufacturing is the consuming public, which has no way of learning of violations short of illness resulting from the consumption of defective drug products. In this sense the enforcement needs of drug-industry regulation are considerably more critical than those before the Court in Barlow's.
 
 
 21
 As for privacy guarantees, the Supreme Court points out that a warrant provides assurances that the proposed "inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria." Id. at 323, 98 S.Ct. at 1825 (footnote omitted). The notice of inspection used in this case satisfies at least some of these criteria. It informs the "owner or agent in charge" (§ 374(a)) of the "scope and objects of the search." Barlow's, supra, 436 U.S. at 323, 98 S.Ct. at 1825. Although the notice of inspection makes no express reference to reasonableness under the Constitution, it clearly states that notice is given pursuant to 21 U.S.C. § 374, which is enacted by the Congress. The name of the firm and address is also prominently listed. Further, the notice of inspection reproduces large portions of § 374(a), stating the areas and objects to be searched; that the inspection is to take place at reasonable times; that certain records are to be made available to the inspector; that each inspection must be made with reasonable promptness; that each inspection must be accompanied by a separate notice; and that the purpose of any inspection of a prescription-drug operation is discovery of information "bearing on whether prescription drugs (are being) adulterated or misbranded within the meaning of" the Act or on other violations of the Act.[8] 21 U.S.C. § 374(a). Equally important, the Notice of Inspection informs the owner of what cannot be examined by the inspector. Inspections relating to prescription drugs do not extend to financial data, pricing data, and certain data regarding sales, personnel, and research.[9] Ibid.
 
 
 22
 In sum, the authorizing statute now before the Court was not painted with so broad a brush as the one rejected in Barlow's, the enforcement needs are more critical in the drug-manufacturing field, and the interests of the general public are more urgent. We hold that inspections authorized by § 374 are "reasonable" and therefore not inconsistent with the Fourth Amendment. Thus, this case falls within the "carefully defined classes of cases" which are an exception to the search-warrant requirement.[10] Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). We share, to a degree, the fears expressed by appellants that many businesses are thoroughly regulated by the United States, and that an undue extension of our rationale might obliterate much of the Fourth Amendment's protection. On balance, however, we are persuaded that the capacity for good or ill of the manufacture of drugs for human consumption is so great that Congress had power to enact § 374(a).
 
 
 23
 Having concluded that drug manufacturing is a "pervasively regulated" industry does not end our inquiry,[11] but establishes only that Congress has broad authority to place restrictions on that industry that might otherwise violate the Fourth Amendment. A question remains as to whether the conduct of the government in this case conforms with the statutory scheme provided by the Congress.
 
 
 24
 The Court in Colonnade Catering Corp. v. United States, supra, confronted a very similar issue. There Internal Revenue Service agents, suspecting a violation of the federal excise tax law, sought to inspect an establishment where liquor was being served.[12] The owner refused to open a locked storeroom and asked if the agents had a search warrant. The agents answered that they didn't need a warrant, broke the lock, entered, and found evidence of regulatory violations.
 
 
 25
 After emphasizing the long history of regulation of the sale of liquor, the Court acknowledged the broad authority of Congress to provide for inspections under the liquor laws. Colonnade, supra, 397 U.S. at 75-76, 90 S.Ct. at 776-777. Under the existing statutory scheme, however, the Court concluded that Congress had not provided for "forcible entries without a warrant," id. at 77, 90 S.Ct. at 777. This conclusion was based on Congress's provision of a separate penalty for a dealer's refusal to permit an inspection.[13] Compare Biswell, supra, 406 U.S. at 314, 92 S.Ct. at 1595. Consent being absent, the search was held invalid, and the evidence suppressed.
 
 
 26
 The Federal Food, Drug, and Cosmetic Act contains provisions, similar to those addressed in Colonnade, which punish refusals to permit inspections by imprisonment up to one year, or a fine of not more than $1,000, or both. 21 U.S.C. §§ 331(f) and 333(a).[14] It follows, therefore, as in Colonnade, that an inspection pursuant to a § 374 notice to inspect is authorized only when there is a valid consent. If consent is withheld, a separate violation of the Act occurs, and the FDA inspectors are required to obtain a warrant before the inspection can proceed.
 
 
 27
 This brings us to the problem presented by the search at the Wentzville site. Here, as in Colonnade, the critical issue is whether there was consent to the inspection.[15] Unfortunately this issue was not expressly resolved in the court below. The magistrate approved the Wentzville inspection but made no findings on the consent issue.[16] Although there is evidence in the record from which consent could have been found, the trier of fact was not required to believe it, and we are not at liberty to make our own findings. Therefore, as to Counts VII and VIII, the counts as to which evidence was taken from the Wentzville site, the judgments of conviction will be vacated, and the cause remanded for the making of further findings on the issue of consent. The district court may hold a further hearing on this issue if it wishes, but the existing record may be sufficient.
 
 
 28
 We add a word of clarification as to the meaning of the term "consent" as we intend it in this context. We do not mean, by imposing a requirement of "consent," to require a factual determination as to whether appellants, with respect to the Wentzville site, knowingly and understandingly relinquished a known right. The question is whether appellants refused to permit entry or inspection, thereby violating 21 U.S.C. Sec. 331 (f). If they did so refuse, then FDA was obliged to obtain an administrative warrant in order to effect the inspection, and could also seek a separate criminal prosecution for the refusal itself. If appellants did not refuse to permit entry or inspection, then they "consented" to the search and seizure, as we use that term here. This formulation, while it may not answer every question that may arise with respect to searches and seizures pursuant to Sec. 374 notices of inspection, seems to us to be the most logical way to harmonize Biswell and Colonnade. As the court said in United States v. Litvin, supra, 353 F. Supp. at 1338:
 
 
 29
 Therefore, as in Colonnade, if defendant refused entry to the Food and Drug Administration inspectors he was in violation of Sec. 331(f) and subject to one-year imprisonment and/or $1000 fine. But if defendant refused entry, the inspectors had no right to enter the storeroom, and following Colonnade, any evidence seized as a result of the search must be suppressed.
 
 The Morganford Road Inspection
 
 30
 The inspection and seizures conducted at the Morganford Road site were supported not only by a statutory notice, but also by a Warrant for Inspection issued by a United States Magistrate on October 23, 1975, and a Warrant for Arrest of Property issued by the clerk of the district court on October 29, 1975.[17] Appellants now argue that the inspection and seizures were illegal because the application for the warrant for inspection did not comply with traditional probable-cause standards. Marshall v. Barlow's, Inc., supra, however, teaches that "(p)robable cause in the criminal law sense is not required ..." to secure a warrant for an administrative search. 436 U.S. at 320, 98 S.Ct. at 1824. Probable cause for administrative-search purposes may be based on "specific evidence of an existing violation," ibid. (footnote omitted), or a "showing that 'reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular (establishment).' " Ibid., citing Camara v. Municipal Court, 387 U.S. 523, 538, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). Those standards are met here, where the application for the inspection warrant contained evidence of numerous violations of the FDCA, sworn to by an FDA investigator.[18]
 
 
 31
 Appellants next argue that the inspections were part of an ongoing criminal investigation, and that therefore a warrant issued on less than criminal probable cause was not sufficient to authorize a search.[19] It is our view that a warrant based on an administrative showing of probable cause is valid in this pervasively regulated industry. To hold otherwise would be inconsistent with our conclusion, already expressed, that warrantless entry under a notice of inspection does not violate the Fourth Amendment in the drug-manufacturing field. Probable-cause standards are relaxed because the business person engaged in this industry has a lesser expectation of privacy.
 
 
 32
 The appellants cite Michigan v. Tyler, 436 U.S. 499, 512, 98 S.Ct. 1942, 1951, 56 L.Ed.2d 486 (1978), for the proposition that where the government has probable cause to believe that a crime has been committed, access to gather evidence for a criminal prosecution requires a warrant issued upon a traditional showing of probable cause. Tyler involved a series of searches by a fire marshal at the scene of a fire. During the initial inspection two containers of flammable liquid were found. Suspecting arson, the fire chief summoned police and turned over the containers. Later that day the marshal, continuing his initial investigation, discovered suspicious burn marks on some carpet and other evidence of arson. Some weeks later fire officials returned to the premises on several occasions to gather evidence. The Supreme Court held that
 
 
 33
 an entry to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze. Thereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches. Evidence of arson discovered in the course of such investigations is admissible at trial, but if the investigating officials find probable cause to believe that arson has occurred and require further access to gather evidence for possible prosecution, they may obtain a warrant only upon a traditional showing of probable cause applicable to searches for evidence of a crime.
 
 
 34
 Id. at 511-12, 98 S.Ct. at 1950-51 (citations omitted).
 
 
 35
 The answer is that Tyler did not involve pervasively regulated industries, which the Supreme Court has referred to as "exceptions" that are "responses to relatively unique circumstances." Barlow's, 436 U.S. at 313, 98 S.Ct. at 1820. The rule in Tyler rests on a different foundation from the rule applicable to pervasively regulated industries. In Tyler the Court saidthere is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, ....
 
 
 36
 436 U.S. at 506, 98 S.Ct. at 1948. In the case of the inspection to discover the cause of a fire, the reasonable expectation of privacy remains, but the basis for the pervasively-regulated-industry exception to the warrant requirement is that there is no reasonable expectation of privacy. See Barlow's, 436 U.S. at 313, 98 S.Ct. at 1820. Therefore, Tyler is not determinative.
 
 
 37
 For these reasons we hold that in the case of a pervasively regulated industry warrants based on an administrative showing of probable cause are valid so long as the extent of the intrusion is limited to the purposes specified in the statute.[20] In Barlow's the Supreme Court indicated that specific evidence of an existing violation (and the FDA had such evidence here) could justify a search based upon an administrative warrant, even though OSHA contains criminal as well as civil penalties. See 29 U.S.C. § 666. Thus the evidence from the Morganford Road site was not seized in violation of the Fourth Amendment and was properly admissible at trial.[21] The question of consent, discussed above with respect to the Wentzville site, does not arise here, because the agents did obtain a warrant based on a valid administrative showing.
 
 The Chambers Medical Group Search
 
 38
 During the course of the trial an issue arose concerning several searches of a dispensary in the ground-floor area of the Chambers Medical Group building in St. Louis, owned by a Dr. Salit. Appellants question the legality of these searches.
 
 
 39
 A Dr. Eckert testified that he and Dr. Salit were "partners" in a "corporation" engaged in the practice of medicine in the building. The doctors made arrangements with Jamieson, Jr., to open a dispensary on the lower floor of "their" building. Jamieson, Jr., was to pay rent, hire employees, pay for the utilities, stock the dispensary, and pay all other ancillary expenses, and at the end of each month the profits were to be divided between the doctors' corporation and Jamieson, Jr. There was further testimony that the dispensary ceased doing business on October 29, 1975, after there were reports in the press of the searches at Morganford Road. During and after the period when the dispensary was operating (roughly April 1975 to October 29, 1975), both doctors and their employees had unlimited access to the dispensary and had their own keys.
 
 
 40
 The agent who conducted the searches testified that he visited the store on November 7, 10, 11, 12, 14, 17, and 24, 1975. He also testified that after he presented his credentials Dr. Eckert let him in and gave permission to collect samples. The district court ruled that Dr. Eckert had capacity to consent to the search and that he did give his consent to the FDA inspector. The lower court's ruling was based on United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), in which the Supreme Court said
 
 
 41
 proof of voluntary consent (to a warrantless search), ... is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.
 
 
 42
 Id. at 171, 94 S.Ct. at 993 (footnote omitted).
 
 
 43
 We agree with the district court. The agent obtained entry to the dispensary area after Dr. Eckert "offered him a key," and there were no threats or overbearing assertions of authority. The doctors and Jamieson, Jr., were in effect in business together, and Dr. Eckert's authority to consent to the searches cannot be seriously questioned. Therefore the searches at the Chambers Medical Group building were not in violation of the Fourth Amendment.
 
 III. Miranda Warnings
 
 44
 Appellants next argue that certain statements made by the defendants to FDA agents during the searches were inadmissible at trial because Miranda warnings were not given. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The district court held that Miranda was not applicable because "the evidence failed to establish that defendants ... were in a custodial situation, subject to arrest."
 
 
 45
 Evidence presented at trial showed that FDA agents are without authority to make arrests, that the defendants' movements were not restricted during the time of the search, and that there were no threats or coercion. Evidence also indicated that appellants' employees were free to go about their business, and that consultation with attorneys was not limited. There is ample evidence to support the district court's finding, and the statements were therefore properly admitted at trial.
 
 IV. Sufficiency of the Evidence
 
 46
 Appellants next argue that there was insufficient evidence to support conviction of any of the 11 counts charged. The substantive counts II through XI will be discussed first, with the conspiracy charge, count I, discussed last.
 
 Count II
 
 47
 Count II of the indictment alleged, and the district court found, that the defendants sold counterfeit Motrin tablets to a Dr. Zack Barnes of Kansas City, Missouri, with the intent to defraud and mislead. See 21 U.S.C. §§ 321(g)(2), 331(i)(3), and 333(b). A "counterfeit drug" is defined as
 
 
 48
 a drug which, or the container or labeling of which, without authorization, bears the trademark, trade name, or other identifying mark, imprint, or device, or any likeness thereof, of a drug manufacturer ... other than the person or persons who in fact manufactured, processed, packed, or distributed such drug and which thereby falsely purports or is represented to be the product of ... such other drug manufacturer ....
 
 
 49
 21 U.S.C. § 321(g)(2). "Motrin" is the trademark of the Upjohn Company used for the drug ibuprofen since 1970. Upjohn has never authorized any of the defendants to manufacture ibuprofen or to use the trademark Motrin. Since October 1974, Upjohn has manufactured and distributed Motrin tablets, which are coated, round, orange tablets with the logo "Upjohn 750" on one side. When Motrin was first marketed, demand exceeded supply, resulting in a nation-wide shortage from late 1974 until late 1975. During the Motrin shortage in June of 1975, Jamieson, Jr., ordered and received 200,000 magnesium salicylate tablets from C.M. Bundy Company of Cincinnati, Ohio. At Jamieson, Jr.'s, request C.M. Bundy manufactured the tablets to resemble a Motrin tablet. Sometime after this, in response to an order by Dr. Zack Barnes, Jamieson-McKames sent Dr. Barnes a bottle with "Motrin" printed on a Pharmacare Payless label, thereby falsely representing the contents as Motrin.[22]
 
 
 50
 We affirm the trial court's judgment of conviction on count II. Where a trial, like this one, is to the court rather than a jury, the standard of review is "whether there is substantial evidence, taking the view most favorable to the government, to support the fact determination by the trial court." United States v. Cady, 567 F.2d 771, 774 (8th Cir. 1977), cert. denied, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); United States v. Marley, 549 F.2d 561, 563 (8th Cir. 1977). This standard is more than adequately met for count II.
 
 Count III
 
 51
 Count III charged, and the district court found, that the defendants caused the misbranding of magnesium salicylate tablets as "Motrin formula" while they were held for sale after shipment in interstate commerce in violation of 21 U.S.C. §§ 331(k) and 333(b). A drug is "misbranded" "(i)f its labeling is false or misleading." 21 U.S.C. § 352(a).
 
 
 52
 Magnesium salicylate tablets were shipped in bulk in interstate commerce by C.M. Bundy of Cincinnati, Ohio, to the appellants, who then packed the tablets in bottles labeled "Motrin formula." There was testimony that the "Motrin formula" label represented the tablets to be products of the Upjohn Company and to contain ibuprofen, both of which representations proved to be false. There was further testimony of FDA investigators who presented prescriptions for Motrin at various pharmacies operated by appellants that they were sold magnesium salicylate tablets instead.
 
 
 53
 It is noteworthy that the above listed incidents were not isolated ones, according to evidence presented at trial. There was testimony that the appellants made similar shipments to a Pharmacare pharmacy in St. Clair, Missouri, and to the Chambers Group dispensary, where the tablets were routinely dispensed as Motrin. This pattern is important, because 21 U.S.C. § 333(b) provides for more severe penalties for violations of the Act accompanied by the intent to defraud or mislead. The trial court's finding on this element of the crime is more than amply supported by the record. The judgment of conviction on count III is affirmed.
 
 Count IV
 
 54
 Count IV of the indictment alleged that the appellants held for sale counterfeit "Valium" with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331(i)(3) and 333(b). The district court found that the appellants sold and held for sale bottles of diazepam tablets which bore the trademark "Valium," a trademark held by Hoffman-LaRoche, Inc., which never authorized its use by the appellants.
 
 
 55
 It was stipulated at trial that appellants were not authorized to use the trademark or to manufacture diazepam. The government also introduced at trial a bottle labeled "Valium" that was seized in the retail section of the pharmacy on Morganford Road. The tablets were virtually the same size, shape, and color as the Hoffman-LaRoche product. Jamieson-McKames obtained bulk diazepam from Gyma Laboratories, and the tablets were then manufactured at Morganford Road and labeled as valium. Jamieson, Sr., was said to have made "Valium" two to four times a month during the period between 1972 and the time of the inspection in October of 1975.
 
 
 56
 There is ample evidence to sustain the convictions on count IV, especially considering the frequency and duration of the violations. The appellants' use of diazepam contrary to the patent seemed to be a calculated effort to substitute their product for the brand-name drug. The district court's judgment of conviction on count IV is affirmed.
 
 Count V
 
 57
 Count V of the indictment charged the appellants with causing the adulteration of a drug held for sale with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331(k) and 333(b). A drug is "adulterated"
 
 
 58
 if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess ....
 
 
 59
 21 U.S.C. § 351(a)(2)(B). If the drug is not recognized in an official compendium, it is also adulterated if its "strength differs from, or its purity or quality falls below, that which it purports or is represented to possess." 21 U.S.C. § 351(c).[23]
 
 
 60
 Evidence presented at trial tended to show the following: In January 1975, pursuant to an order from Pharmacare Generics, a shipment of potassium phenoxymethyl penicillin (pen V) with an expiration date of August 1975, was sent from Zenith Laboratories in New Jersey to appellants' place of business in St. Louis, Missouri. During the ensuing months up to the time of the inspections at Morganford Road, bottles of pen V were relabeled. The replacement labels bore the name Pharmacare Generic, Inc., rather than Zenith Laboratories, Inc., and read in part, "Cherri-Penn" ..., "Flavored Potassium Penicillin G" ..., "Exp. Date: 7/77." No records were kept of this relabeling procedure.
 
 
 61
 During the FDA inspections at the Morganford site the pen V bottles were found in the wholesale section of the pharmacy. One of the boxes with a Zenith pen V label on the outside contained 18 bottles with Pharmacare Generic labels. The Pharmacare Generic labels represented that the bottles contained potassium penicillin G (pen G).
 
 
 62
 Our examination of the record reveals evidence of the appellants' failure to keep records of the receipt, repacking, and labeling of the pen V. This evidence supports a conviction under § 351(a)(2)(B) because of a lack of conformity "with current good manufacturing practice."[24] Evidence presented also supports conviction under § 351(c), because the bottles in question contained pen V rather than pen G, thus rendering the strength and purity of the substance different from what the labels represented. We therefore affirm the judgment of conviction on Count V.
 
 Count VI
 
 63
 Count VI also involves the appellants' relabeling of the bottles of pen V. According to the indictment the drugs labeled, in part, "Flavored Potassium Penicillin G Powder" ..., "Exp. Date 7/77," were in violation of § 352(a), which deems a drug misbranded if its label is false or misleading. The drug was also said to be misbranded under § 352(l ), in that it was represented to be composed of penicillin, at least in part, and there was no certificate in effect as to the drug.[25]
 
 
 64
 Evidence presented at trial indicated that in January 1975 the appellants purchased bottles of pen V powder which was certified until August 1975. There was testimony that such a product could be obtained at a reduced price because the expiration date was so near. Jamieson, Jr., was said to have directed Jamieson-McKames employees to replace the pen V labels with pen G labels and to extend the expiration date to July 1977. The expiration date on the label of the "Flavored Potassium Penicillin G Powder" was not approved by the FDA and was not based on stability testing, as required by 21 C.F.R. § 432.5(a)(3).
 
 
 65
 This evidence supports a conviction of misbranding under 21 U.S.C. § 352(l ), in that the drug contained penicillin and was not properly certified. Although, as originally labeled, the drug was certified by the FDA, the certification ceased to be effective when the labeling was altered. 21 C.F.R. § 431.11(a)(2). The drugs were also misbranded within the meaning of § 352(a) because their labels were "false or misleading." The evidence established that the expiration date was false, and that the bottles did not contain pen G as represented on the label. The evidence is sufficient under either of the above provisions.
 
 
 66
 Appellants argue that there was insufficient evidence to show that the bottles of pen G were "held for sale" as required by 21 U.S.C. § 331(k). The argument is based on considerable testimony at trial indicating that the section of the pharmacy in which the pen G bottles were stored was a designated quarantine area reserved for products that were not for sale. This testimony was not uncontradicted, however. One former employee testified that she never heard that section of the pharmacy referred to as a quarantine area. An FDA inspector also testified that one of the pharmacists, Mr. Abelson, told him during the inspection that all drugs in the section were to be sold. The inspector testified further that there were no signs designating a quarantine area. The record is sufficient to support the trial court's finding that the drugs were being held for sale. The statute does not require that sales actually take place. The trial court found that appellants purchased bottles of a soon-to-expire drug, removed the labels, and replaced them with labels bearing false information. Inferring from these facts an intent to market the drugs is only common sense.
 
 
 67
 Appellants next argue that counts V and VI involve identical proof, and that therefore the district court erred in permitting prosecution of both counts based on the same conduct. They point out that both counts are laid under the same statutes, 21 U.S.C. §§ 331(k) and 333(b).
 
 
 68
 This argument is contrary to United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964), which specifically dealt with the scope of § 331(k). There the Court said:
 
 
 69
 The language of § (331(k)) unambiguously defines two distinct offenses with respect to food held for sale after interstate shipment. As originally enacted in 1938, the subsection prohibited "(t)he alteration, mutilation, destruction, obliteration, or removal" of the label, or "the doing of any other act" with respect to the product which "results in such article being misbranded." The section was amended in 1948 to prohibit additionally "the doing of any other act" with respect to the product which "results in such article being adulterated."
 
 
 70
 Id. at 89, 84 S.Ct. at 562 (footnotes omitted).[26] Thus, it is clear that separate prosecutions for misbranding drugs and adulterating drugs are consistent with the intent of Congress and are within the language of the statute. Nor do counts V and VI conflict with the rule of Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):
 
 
 71
 The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.
 
 
 72
 The proof required by count V involved, among other things, lack of conformity with good manufacturing practices by failure to keep adequate records of the relabeling process. This conduct comes within "the doing of any other act" which "results in such article being adulterated." 21 U.S.C. § 331(k). The misbranding charged in count VI was proved by evidence of "alteration of the labeling" that rendered the label false or misleading. These crimes are distinct, and different facts were proved to support conviction. For example, had the appellants removed the Zenith Laboratories labels and replaced them with Pharmacare labels which were accurate in every way, the failure to keep records of the relabeling process would still support a charge of adulteration. The government need not prove that the labels were false or misleading as required for a misbranding charge, but only that current good manufacturing practice was not followed.
 
 
 73
 There is ample evidence in the record to support the judgment of conviction on count VI.
 
 Counts VII and VIII
 
 74
 Count VII of the indictment alleged and the district court found that the appellants held for sale counterfeit Cleocin tablets. "Cleocin" is the trademark of the Upjohn Company for the drug clindamycin hydrochloride. Upjohn also holds the patent for clindamycin. Count VII is based on a bottle with a Pharmacare Payless label, labeled "300 Cleocin 150 mg.," which was held for sale at the Wentzville pharmacy. The bottle was said to be a "counterfeit drug" because its label bore the trademark "Cleocin" without the authorization of the Upjohn Company. 21 U.S.C. § 321(g)(2).
 
 
 75
 Evidence introduced at trial indicated that Jamieson-McKames received shipments of encapsulated tetracycline at the Morganford Road premises. These capsules were then emptied by Jamieson-McKames employees and later used to fill capsules which were bottled and labeled as "Cleocin." Further testimony showed that the "Cleocin" made from tetracycline was manufactured on a regular basis during 1974 and 1975.
 
 
 76
 Count VIII is based on the same bottle labeled "Cleocin" from the Wentzville pharmacy. Count VIII alleged the appellants caused the misbranding of the Cleocin under three separate sections of the Food, Drug, and Cosmetic Act. First, the drug was said to be misbranded within the meaning of 21 U.S.C. § 352(a) because the statement "300 Cleocin 150 mg." appearing on the label represented the drug to contain clindamycin hydrochloride when it contained tetracycline. Misbranding under § 352(a) requires only that the label be false or misleading. Second, the Cleocin was alleged to be misbranded under 21 U.S.C. § 352(j), which deems a drug misbranded "if it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." Third, the "Cleocin" was said to be misbranded under 21 U.S.C. § 352(l ), because it purported to be the antibiotic drug clindamycin hydrochloride, but it was from a batch for which no certificate had been issued pursuant to 21 U.S.C. § 357.
 
 
 77
 The record reveals the following evidence relative to count VIII. The bottle labeled Cleocin contained capsules very similar in size, shape, and color to Upjohn's Cleocin 150 mg. FDA analysis showed the capsules contained tetracycline, a yellow powder, and no clindamycin. The reencapsulating process was accomplished by Jamieson, Sr., Jamieson, Jr., and several employees under Jamieson, Sr.'s supervision. These capsules were then bottled and labeled with a Pharmacare Payless Pharmacy label and held for sale at the Wentzville pharmacy.
 
 
 78
 In addition the government presented expert testimony indicating that the substitution of tetracycline for clindamycin hydrochloride would create significant health risks, including the risk of death, to patients for whom clindamycin is prescribed.[27]
 
 
 79
 Lastly, clindamycin was shown to be an antibiotic which must be certified by the FDA prior to marketing. 21 U.S.C. § 357(a); 21 C.F.R. § 430.4(a)(34). It was also shown that the drug in question was not certified, and that appellants did not request certification.
 
 
 80
 The evidence in the record outlined above is sufficient to sustain convictions on counts VII and VIII. The bottle of capsules that is the basis of these counts, however, was obtained through the inspection of the Wentzville site. As was discussed earlier, the issue of the legality of the Wentzville search is unresolved pending remand to the district court on the issue of consent. Thus the judgments of conviction on counts VII and VIII must be vacated, subject to reinstatement or dismissal depending on the resolution of the consent-to-inspect issue. If the government wishes to pursue these counts, and the district court finds that there was a valid consent to the inspection under § 374(a), the convictions can be reinstated, subject of course to appeal. If consent is found lacking, counts VII and VIII should be dismissed.
 
 Count IX
 
 81
 Count IX of the indictment charged, and the district court found, that the appellants caused the adulteration of a drug sold as "Ampicillin" in violation of 21 U.S.C. §§ 331(k) and § 333(b). According to the indictment the drug was adulterated in two ways: (1) within the meaning of 21 U.S.C. § 351(a) (2)(B), because of failure to follow current good manufacturing practice, and (2) under 21 U.S.C. § 351(b), because the strength of the drug differed from the standards set forth in an official compendium.
 
 
 82
 Evidence relevant to count IX showed the following: Pursuant to an order by Jamieson, Jr., Pharmacare received a shipment of potassium penicillin G (pen G) pills from Mallinckrodt Chemical Works in Raleigh, North Carolina. Because Mallinckrodt was discontinuing sales of antibiotics, drugs like pen G were available at reduced prices. The tablets were then ground up in a coffee grinder and packed into capsules which were then placed in bottles of 1000 each and labeled "Ampicillin." These bottles were placed in the wholesale section of the pharmacy[28] and were used to fill orders for ampicillin.[29]
 
 
 83
 The evidence supports a finding of adulteration of drugs for failure to follow current good manufacturing practices during the processing and packing of the drug. 21 U.S.C. § 351(a)(2)(B). FDA regulations interpreting "current good manufacturing practice" require production and control procedures to include "all reasonable precautions" to assure the safety, strength, quality, and purity of the drugs produced. The evidence indicates the appellants did not meet these standards. 21 C.F.R. § 211.40. Nor did appellants keep adequate records of the significant steps in the production process, as required by 21 C.F.R. § 211.40(a). FDA investigators specifically asked for, but were not shown, manufacturing records for ampicillin.
 
 
 84
 The evidence also supports a charge of adulteration as defined by § 351(b), because the drug's strength, quality or purity differed from the standards set forth in a recognized compendium. Both pen G and ampicillin are drugs recognized by the United States Pharmacopeia (U.S.P.), but they are different from each other and have different pharmacological effects. A product containing pen G cannot meet the standard for ampicillin; thus, the strength of the drug differed from the standard set out in the U.S.P.
 
 
 85
 The evidence on count IX is far from insufficient. Accordingly the judgments of conviction on count IX are affirmed.
 
 Count X
 
 86
 Count X charges that the "ampicillin" that was the basis of count IX was also misbranded within the meaning of 21 U.S.C. § 352(a), (j), and (l ), thus violating §§ 331(k) and 333(b). Misbranding under § 352(a) occurs whenever a drug's label is false or misleading. Section 352(j) deems a drug misbranded when it is dangerous to health when used in the manner or dosage prescribed. Finally, a drug is within the proscription of § 352(l ) when it is composed, at least in part, of an antibiotic, and the certification or release requirements of 21 U.S.C. § 357 have not been met. Section 357 requires that antibiotics be certified prior to their sale.
 
 
 87
 Evidence presented at trial showed bottles of drugs were labeled "1000 AMPICILLIN 250," a label representing them to contain ampicillin, when they actually contained pen G. Thus the drugs' labels were false and misleading under § 352(a).
 
 
 88
 Testimony of an expert witness called by the government indicated that the substitution of pen G for ampicillin was dangerous to health, because the drugs have different uses and properties. Pen G and ampicillin are effective against different types of infections. Pen G can be used for Gram-positive infections but not Gram-negative ones. Ampicillin, although effective against both types, was developed specifically to treat Gram-negative infections. The substitution of pen G for ampicillin would result in ineffective treatment of Gram-negative infections. In addition, the absorption rates of the two drugs are very different, so different doses of each are required. Thus even in those instances when both drugs are generally effective, replacement of ampicillin with pen G could result in ineffective treatment. The drug was therefore dangerous to health when used in the manner and dosage prescribed. 21 U.S.C. § 352(j).
 
 
 89
 Lastly, the evidence proved that pen G and ampicillin are antibiotic drugs that must be certified by the FDA prior to marketing. 21 U.S.C. § 357; 21 C.F.R. § 430.4(a)(1). Once an antibiotic is certified by the FDA, an expiration date is specified. The bottles of "Ampicillin" found at Morganford Road were not certified, nor had certification been requested. This lack of certification amounted to misbranding under 21 U.S.C. § 352(l ).
 
 
 90
 The record supports the trial court's findings under all of the above statutory provisions. The judgments of conviction on count X are affirmed.[30]
 
 Count XI
 
 91
 Count XI charges, and the district court found, that the defendants caused the misbranding of Neomycin-Polymyxin eardrops under 21 U.S.C. §§ 352(a) and 352(l ). The statement "Expiration date 8/76" appearing on the label was said to be false and misleading and thus within § 352(a). The eardrops were also alleged to contain derivatives of the antibiotics neomycin and polymyxin, which are subject to certification and release requirements. 21 U.S.C. § 357(a); 21 C.F.R. §§ 430.4(a)(16), 430.4(a)(23). The failure to meet these requirements was said to render the drugs misbranded under § 352(l ).
 
 
 92
 The record showed the following: Neomycin-Polymyxin eardrops with hydrocortisone and disperodon are drugs. Bottles of the eardrops were shipped to Jamieson-McKames from Atlanta, Georgia, pursuant to an order of Jamieson, Jr., in September of 1974. The eardrops bore an expiration date of July 1975. During the summer of 1975 Jamieson, Jr., directed Jamieson-McKames employees to remove the labels on the eardrops and replace them with labels with an expiration date of 8/76. This operation was carried out on several occasions. The eardrops were then distributed by Pharmacare Generic and Pharmacare according to the statement on the label. A number of the bottles were shipped from Morganford Road to the Payless Pharmacy in Salem, Missouri.
 
 
 93
 The appellants, moreover, never filed a request with the FDA for certification of the eardrops with the extended expiration date. Any such change would have had to be based on stability tests, and none was conducted here.
 
 
 94
 The above evidence amply supports the trial court's findings of misbranding under §§ 352(a) and (l ) and the ultimate violations of §§ 331(k) and 333(b). The judgments of conviction on count XI are affirmed.Count I
 
 
 95
 Count I of the indictment alleged, and the district court found, that the appellants engaged in a conspiracy from January 1, 1974, to November 5, 1975, to violate the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 321-392. The indictment charges that the appellants, with the intent to defraud and mislead, sold and dispensed counterfeit drugs in violation of 21 U.S.C. §§ 331(i)(3) and 333(b), and manufactured, processed, packed, and labeled drugs in such a way that they were adulterated and misbranded in violation of 21 U.S.C. §§ 331(k) and 333(b). In furtherance of the conspiracy, at least one of the appellants was alleged to have committed at least one of eight overt acts listed in the indictment.
 
 
 96
 Appellants now challenge the sufficiency of the evidence supporting the conspiracy charge.
 
 
 97
 There is ample evidence in the record that the appellants collaborated in the manufacturing, processing, packaging, and labeling of drugs in violation of various provisions of the Federal Food, Drug, and Cosmetic Act. A review of the evidence presented in our discussion of counts II through XI demonstrates continuous, widespread violations of the Act, the involvement of each of the individual defendants, and the participation of the interconnecting corporate entities. For example, Morganford Road was the site of various operations of each of the four corporate defendants. Bills owed by the several retail pharmacies were forwarded to the Morganford Road address. Jamieson, Jr., was a corporate board member of all four corporations, and Jamieson, Sr., was a board member of three of the four. The district court found, and the evidence supports the finding, that Jamieson, Sr., and Jr. had complete control of the various corporate defendants and used them to suit their own purposes. Nor does the evidence paint a picture of compartmentalized corporate functions, with information available to one corporation but not available to another. The unity of action was nearly complete.
 
 
 98
 The law has long recognized that the existence of a conspiracy need not be shown by direct proof, but that the common purpose or plan can be inferred from circumstantial evidence. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Here, the evidence is not reflective of isolated or inadvertent instances of adulteration, misbranding, and counterfeiting, but of a continuous pattern of illegal conduct. The district court's finding of an agreement to violate the Act is fully supported. Our discussion of counts II-VI and IX-XI demonstrates the existence of adequate proof of several of the overt acts charged in the indictment.[31] What emerges is an overall plan to substitute less expensive drugs for more expensive, disregarding the safety of the public and the provisions of the Act.
 
 Civil Action for Condemnation
 
 99
 The civil action was brought pursuant to 21 U.S.C. § 334(a)(2)(C), which authorizes condemnation of "(a)ny punch, die, plate, stone, labeling, container, or other thing used or designed for use in making a counterfeit drug or drugs." The various articles of equipment involved here were seized on December 19, 1975, at the Morganford Road premises and consist of the following:[32]
 
 
 100
 1). One Stokes Model 38A Dryer, Serial No. A13960;
 
 
 101
 2). One Fratelli Zanasi Encapsulating Machine, Serial No. 12134;
 
 
 102
 3). One Patterson Kelley Twin-Shell Blender, Serial No. 163902;
 
 
 103
 4). Three stainless steel coating pans;5). One wooden coating pan;
 
 
 104
 6). One Colton 4-stage Rotary Press (Tablet);
 
 
 105
 7). Four sets of Punches marked "10" on one end and blank on the other end; one Punch marked "10" without the corresponding blank end; and
 
 
 106
 8). Four Dies corresponding to the four sets of Punches.
 
 
 107
 Appellant[33] now appeals the condemnation and forfeiture of the above items of equipment. We have carefully examined the evidence of record as to each item condemned, and the judgment in the civil case is affirmed. The district court's findings are not clearly erroneous (indeed, they are clearly correct), and no error of law appears.
 
 V. Conclusion
 
 108
 The judgments of conviction on Counts I-VI and IX-XI are affirmed. The judgment of condemnation in the civil action is affirmed. The judgments of conviction on Counts VII and VIII are vacated, and the cause remanded for further proceedings (if desired by the United States) as to those counts, in accordance with Part II of this opinion. As a result, the total time of imprisonment is reduced from eight years to seven.
 
 
 109
 It is so ordered.
 
 
 
 [1]
 The Hon. John F. Nangle, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 United States v. All Equipment Including But Not Limited To An Encapsulating Machine Not Identified As To Manufacturer, 475 F.Supp. 39 (E.D.Mo.1979)
 
 
 [3]
 21 U.S.C. § 374(a) provided in part at the time relevant to this case:
 (a) For purposes of enforcement of this chapter, officers or employees duly designated by the Secretary, upon presenting appropriate credentials and a written notice to the owner, operator, or agent in charge, are authorized (1) to enter, at reasonable times, any factory, warehouse, or establishment in which food, drugs, devices, or cosmetics are manufactured, processed, packed, or held, for introduction into interstate commerce or after such introduction, or to enter any vehicle being used to transport or hold such food, drugs, devices, or cosmetics in interstate commerce; and (2) to inspect, at reasonable times and within reasonable limits and in a reasonable manner, such factory, warehouse, establishment, or vehicle and all pertinent equipment, finished and unfinished materials; containers, and labeling therein. In the case of any factory, warehouse, establishment, or consulting laboratory in which prescription drugs are manufactured, processed, packed, or held, the inspection shall extend to all things therein (including records, files, papers, processes, controls, and facilities) bearing on whether prescription drugs which are adulterated or misbranded within the meaning of this chapter, or which may not be manufactured, introduced into interstate commerce, or sold, or offered for sale by reason of any provision of this chapter, have been or are being manufactured, processed, packed, transported, or held in any such place, or otherwise bearing on violation of this chapter. No inspection authorized for prescription drugs by the preceding sentence shall extend to (A) financial data, (B) sales data other than shipment data, (C) pricing data, (D) personnel data (other than data as to qualifications of technical and professional personnel performing functions subject to this chapter), and (E) research data (other than data relating to new drugs and antibiotic drugs, subject to reporting and inspection under regulations lawfully issued pursuant to section 355(i) or (j) or section 357(d) or (g) of this title, and data, relating to other drugs, which in the case of a new drug would be subject to reporting or inspection under lawful regulations issued pursuant to section 355(j) of this title). A separate notice shall be given for each such inspection, but a notice shall not be required for each entry made during the period covered by the inspection. Each such inspection shall be commenced and completed with reasonable promptness.
 Samples may be taken during the inspection. See 21 U.S.C. §§ 374(c), (d).
 
 
 [4]
 See 21 U.S.C. §§ 351 and 352 which deal, inter alia, with adulterated drugs and devices (§ 351 generally), adequate controls in manufacture (§ 351(a)), strength, quality, or purity (§ 351(b)), false or misleading labeling (§ 352(a)), certification of certain drugs (§ 352(k) and (l )), color additives (§ 352(m)) and prescription drug advertising (§ 352(n))
 
 
 [5]
 See 21 U.S.C. § 355, which outlines the requirements for new-drug applications, filing procedures, exemptions, records and reports, etc. In addition, every drug manufacturer must register with the Secretary of Health and Human Services on or before December 31 of each year, 21 U.S.C. § 360(b), and the failure to register is a crime, 21 U.S.C. § 331(p)
 
 
 [6]
 While it is true that the Morganford Road inspection, to be discussed below, was conducted pursuant to an administrative warrant obtained six days prior to the actual search, this fact does not necessarily weaken the FDA's argument that warrants as a matter of policy should not be required. The fact that a warrant was obtained on one occasion does not mean that it is practicable to do so in every instance. More important for our analysis, and seemingly also for the Court in Barlow's, is the existence vel non of formal regulations that are inconsistent with the stated needs of enforcement. We find none here
 
 
 [7]
 "29 U.S.C. § 657(f)(1) provides that employees or their representatives may give written notice to the Secretary of what they believe to be violations of safety or health standards and may request an inspection." Barlow's, supra, 436 U.S. at 320 n.16, 98 S.Ct. at 1824 n.16. We consider it less likely that violations of the kind involved in this case will be reported to the FDA by employees of the drug manufacturers
 
 
 [8]
 See note 2 ante for the pertinent portion of § 374(a) contained in the notice to inspect
 
 
 [9]
 The Court in Barlow's noted that "(d)elineating the scope of a search with some care is particularly important where documents are involved." Barlow's, supra, 436 U.S. at 324 n.22, 98 S.Ct. at 1826 n.22. We are persuaded that § 374(a) shows some sensitivity to this concern
 
 
 [10]
 Several courts have addressed this or similar issues. In accord with our conclusion is United States v. New England Grocers Supply Co., 488 F.Supp. 230 (D.Mass.1980). This case involved evidence seized during inspection of a food-supply warehouse pursuant to § 374. United States v. Acri Wholesale Grocery Co., 409 F.Supp. 529 (S.D. Iowa 1976), decided prior to Barlow's, found warrantless searches authorized by § 374 to be consistent with those allowed in Biswell. United States v. Business Builders, Inc., 354 F.Supp. 141 (N.D.Okla.1973), was another pre-Barlow's case involving food. Relying on Biswell, the court said:
 It would be an affront to common sense to say that the public interest is not as deeply involved in the regulation of the food industry as it is in the liquor and firearms industries. (Footnote omitted). One need only call to mind recent cases of deaths occurring from botulism. Modern commerce has devised such an efficient and rapid means of distribution of food products to the consumer that a batch of contaminated food may cause widespread illness and death before the public can be warned and the contaminated products removed from the market.
 
 
 [354]
 F.Supp. at 143. In United States v. Del Campo Baking Mfg. Co., 345 F.Supp. 1371 (D.Del.1972), still another food case, the court considered the regulatory scheme under the Federal Food, Drug, and Cosmetic Act to be as pervasive as the licensing scheme in Biswell. Post-Biswell cases holding a search warrant required in the absence of consent include United States v. Roux Laboratories, 456 F.Supp. 973 (M.D.Fla.1978) (where consent refused, a warrant is necessary). See also United States v. Litvin, 353 F.Supp. 1333 (D.D.C.1973), considering a motion to suppress evidence seized during a routine inspection of a food warehouse. The court treats the food industry as a closely regulated one but requires a warrant when consent to inspect is withheld. Compare the discussion of Colonnade in text infra. Cf. Donovan v. Dewey, --- U.S. ---, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (mining industry held within the Colonnade-Biswell exception)
 
 
 [11]
 Other courts have held the pharmaceutical industry "pervasively regulated" under the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. §§ 801 et seq. United States v. Schiffman, 572 F.2d 1137 (5th Cir. 1978), held that "(t)he pharmaceutical industry is a 'pervasively regulated business' like the liquor and gun industries," id. at 1142, citing United States v. Montrom, 345 F.Supp. 1337, 1340 (E.D.Pa.1972), aff'd mem., 480 F.2d 918, 919 (3d Cir. 1973)
 
 
 [12]
 The Secretary of the Treasury and his agents have broad authority to inspect retail liquor establishments under 26 U.S.C. § 5146(b) and 26 U.S.C. § 7606
 
 
 [13]
 26 U.S.C. § 7342
 
 
 [14]
 21 U.S.C. § 331(f) provides:
 The following acts and the causing thereof are prohibited:
 (f) The refusal to permit entry or inspection as authorized by section 374 of this title.
 21 U.S.C. § 333(a) provides:
 § 333. Penalties-Violation of section 331 of this title
 (a) Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both.
 
 
 [15]
 See United States v. Litvin, 353 F.Supp. 1333 (D.D.C.1973), where the court distinguished Biswell on this basis. See also United States v. Kramer Grocery Co., 418 F.2d 987 (8th Cir. 1969). This case affirmed a ruling that valid consent was necessary before FDA had authority to conduct a warrantless inspection under § 374. Although the rationale of Kramer is inconsistent with our reading of the later-decided cases of Colonnade and Biswell, the holding of Kramer is still valid in the food and drug areas
 
 
 [16]
 The district court adopted the magistrate's recommendation. It relied on Biswell, but that case is not dispositive as to the Wentzville site, because under the Colonnade analysis described above, if consent is refused after a notice of inspection is served, the refusal of consent may be separately prosecuted, but entry cannot be forced without a warrant. This result follows not because Congress could not authorize entry under a notice of inspection over objection, but because, in the food-and-drug area, just as in the liquor area, it has not done so
 
 
 [17]
 Although 21 U.S.C. § 374 authorizes FDA agents to take samples of drugs during an inspection, an in rem action is required if large quantities of drugs or equipment are to be seized. For this reason the FDA obtained the Warrant for Arrest of Property pursuant to 21 U.S.C. § 334(a)(1), which provides procedures closely conforming to those in admiralty
 
 
 [18]
 The application stated that the FDA had information that Jamieson-McKames had received magnesium salicylate tablets from outside the State of Missouri which were made to look like Motrin, a drug manufactured by the Upjohn Company; that the drugs were repacked into bottles labeled with the Motrin brand name; that the FDA had other information indicating Jamieson-McKames packaged or manufactured other drugs which resembled brand-name drugs in shape and appearance; and that Jamieson-McKames was marketing drugs that required prior administrative approval when no applications for approval were on file with the FDA
 
 
 [19]
 There was evidence that the FDA investigators were accompanied by law-enforcement officers from the State of Missouri. Also, on several occasions prior to the Morganford Road inspection FDA agents made undercover buys of defective drugs at various pharmacies owned by the appellants. The appellants argue that there can be little doubt that the government contemplated bringing criminal charges. The evidence supports this view
 
 
 [20]
 A different issue would be presented where inspectors used their regulatory authority to gather evidence of a crime or violation outside the scope of the authorizing statute. That case is not presented here, where only violations of the FDCA were prosecuted
 
 
 [21]
 We have considered and hold to be without merit appellants' statutory argument that searches of pharmacies here were invalid under 21 U.S.C. § 374(a) (1). Appellants' pharmacies were closely related to their manufacturing activities
 
 
 [22]
 The FDA analysis established that the drug contained no ibuprofen. The fact that the tablets did not contain Motrin's active ingredient, ibuprofen, is not relevant to the charge of counterfeiting. The essence of counterfeiting is the unauthorized use of the trademark, trade name, or other identifying mark. Thus, even if the tablets were chemically indistinguishable from Motrin, counterfeiting could still be found
 
 
 [23]
 Appellants were charged in Count V under § 351(c) as well as under § 351(a)(2)(B), because Cherri-Penn flavored Potassium Penicillin powder, the drug involved, is not recognized in an official compendium, the United States Pharmacopeia
 
 
 [24]
 Appellants' argument that § 351(a)(2)(B) is unconstitutionally vague is without merit. The constitutionality of the statute was upheld against a vagueness charge in United States v. Article of Drug, 484 F.2d 748 (7th Cir. 1973). In addition, interpretive regulations have been promulgated by the Secretary. Specifically, 21 C.F.R. § 211.80 describes proper record-keeping procedures for packaging and labeling operations. These standards are clear and have not been met by the appellants
 
 
 [25]
 21 U.S.C. § 357 requires that all drugs containing penicillin be certified as to strength, quality, and the like, and be assigned an expiration date
 
 
 [26]
 Although Wiesenfeld was a prosecution involving adulterated food, the statute applies with equal force to drugs
 
 
 [27]
 Dr. Joseph Marr, the government's expert, testified that tetracycline and clindamycin are used to treat different types of infections. Thus, a substitution could result in ineffective therapy. Furthermore, tetracycline only arrests the growth of micro-organisms rather than killing them. Tetracycline can also cause liver degeneration in pregnant women and impair bone development in the fetus. Clindamycin, on the other hand, does not pose such dangers
 
 
 [28]
 The "ampicillin" that is the basis of counts IX and X was seized at the Morganford Road premises
 
 
 [29]
 Evidence indicated that appellants processed, packed, and labeled the pen G "ampicillin," in order to increase the market value of the drug. Mallinckrodt sold the 250 mg. pen G tablets to Jamieson, Jr., for.$9.00 per thousand. Ampicillin was also available, but at a price of $60-70 per thousand. Mallinckrodt sold no ampicillin to the appellants
 
 
 [30]
 Appellants argue that Counts IX and X improperly charge two crimes based on the same conduct. For reasons similar to those discussed above with respect to Counts V and VI, we reject this argument
 
 
 [31]
 Overt acts 2, 4, 5, and 8 relate to substantive counts already affirmed
 
 
 [32]
 Another piece of equipment seized, "Encapsulating Machine Unidentified as to the Manufacturer," is no longer a part of this suit. It was remitted to its lessor, Parke, Davis, on May 23, 1977. United States v. All Equipment Including But Not Limited To An Encapsulating Machine Not Identified As To Manufacturer, 475 F.Supp. 39, 40 (E.D.Mo.1979)
 
 
 [33]
 As claimant of the equipment, Jamieson-McKames is the only appellant in the civil appeal